EAG:SPN:PT:LHE/BDM/MPG
F.#2015R01828

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN 15 2017 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

JORGE ARZUAGA,

           Defendant.

- - - - - - - - - - - - - - X

I N F O R M A T I O N

Cr. No. 17-313 (PKC)
(T. 18, U.S.C., §§ 982(a)(1),
982(b), 1956(h) and 3551
et seq.; T. 21, U.S.C.,
§ 853(p))

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION

        At all times relevant to this Information, unless otherwise indicated:

I.   The Defendant

        1.   The defendant JORGE ARZUAGA was a citizen of Argentina who worked as a client advisor in the private banking sector at a number of prominent banking institutions based in Switzerland.  In or about and between 2001 and 2012, ARZUAGA worked as a client advisor at Swiss Bank A and an affiliate of Swiss Bank A, and, in or about and between 2012 and 2015, at Swiss Bank B.  The identities of Swiss Bank A and Swiss Bank B are known to the United States Attorney.

## II.  Background

### A.  FIFA

2.  The Fédération Internationale de Football Association ("FIFA") was the international body governing organized soccer, commonly known outside the United States as football.  FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland.  FIFA comprised as many as 211 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories.  At various times, FIFA maintained offices both in Zurich and elsewhere in the world, including in the United States, where FIFA maintained a development office since at least 2011.

3.  FIFA's purpose was, among other things, to develop and promote the game of soccer globally by organizing international competitions and creating and enforcing rules that govern the confederations and member associations.  FIFA financed its efforts in significant part by commercializing the media and marketing rights associated with the World Cup, the sport's premier event.

4.  FIFA first instituted a written code of ethics in October 2004, which code was revised in 2006 and again in 2009 (generally, the "code of ethics").  The code of ethics governed

the conduct of soccer "officials," expressly defined by FIFA's
statutes to include, among others, all board members, committee
members, and administrators of FIFA as well as FIFA's
continental confederations and member associations.  Among other
things, the code of ethics provided that soccer officials were
prohibited from accepting bribes or cash gifts and from
otherwise abusing their positions for personal gain.  The code
of ethics further provided, from its inception, that soccer
officials owed certain duties to FIFA and its confederations and
member associations, including a duty of absolute loyalty.  By
2009, the code of ethics explicitly recognized that FIFA
officials stood in a fiduciary relationship to FIFA and its
constituent confederations, member associations, leagues, and
clubs.

      B.    <u>The Continental Confederations</u>

         5.   Each of FIFA's member associations also was a
member of one of the six continental confederations recognized
by FIFA: the Confederation of North, Central American and
Caribbean Association Football ("CONCACAF"), the Confederación
Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations
Européennes de Football, the Confédération Africaine de
Football, the Asian Football Confederation, and the Oceania
Football Confederation.  Under FIFA's statutes, no national

soccer association could become a member of FIFA without first joining one of the six continental confederations.  Member associations were required to pay to FIFA annual dues, known as subscriptions.

6.    In addition to providing representatives who helped to govern FIFA, the six continental confederations worked closely with FIFA and one another to organize international soccer competitions and carry out FIFA directives on a regional basis.  The leaders and representatives of the confederations conducted business with one another, as well as with the leaders and associates of FIFA, throughout the year at locations around the world, including in the United States.

7.    CONCACAF was a continental soccer confederation incorporated as a non-profit corporation in Nassau, Bahamas. CONCACAF comprised as many as 41 member associations, representing organized soccer in North America, Central America, the Caribbean, and three South American countries.  The United States and two of its overseas territories, Puerto Rico, and the United States Virgin Islands, were members of CONCACAF.

8.    CONMEBOL was a continental soccer confederation domiciled and headquartered in Paraguay.  CONMEBOL comprised as many as 10 member associations, representing organized soccer in South America.  Among other tournaments, CONMEBOL organized the

Copa América, featuring the men's national teams of its 10 members and two non-CONMEBOL national teams that were invited to participate, as well as tournaments featuring the top men's club teams, including the Copa Libertadores. At least as early as 2013, CONMEBOL maintained a code of ethics applicable to all CONMEBOL officials, among others, that, among other things, prohibited bribery and corruption and imposed a duty of loyalty.

C.    Regional Federations and National Associations

9.    In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations. The national associations promoted, organized, and governed soccer, often including club-level soccer, within individual nations.

D.    The Sports Marketing Companies

10.    FIFA, the continental confederations, the regional federations and the national member associations often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies and other events, as well as other rights associated with the sport. Often operating in coordination with affiliated consultants and intermediaries,

5

these sports marketing companies, including multinational
corporations with headquarters, offices, or affiliates located
in the United States, often acquired an array of media and
marketing rights, including television and radio broadcasting
rights, advertising rights, sponsorship rights, licensing
rights, hospitality rights, and ticketing rights.  These sports
marketing companies often sold these rights to, among others,
television and radio broadcast networks, sponsors, and sub-
licensees, including those located in the United States.

> 11.   The revenue generated by the commercialization of
the media and marketing rights associated with soccer
constituted an essential source of revenue for FIFA, other
governing bodies and the sports marketing companies.  The United
States was an increasingly important and lucrative market for
the commercialization of these rights.

## III. Additional Relevant Individuals and Entities

> 12.   At various times relevant to the Information,
Alejandro Burzaco was the General Manager, President of the
Board of Directors, and legal representative of Torneos y
Competencias S.A. ("TyC"), a sports media and marketing business
headquartered in Argentina with a number of subsidiaries and
affiliates, including, among others, T&T Sports Marketing Ltd.,
domiciled in the Cayman Islands, TyC International B.V.,

domiciled in the Netherlands, and Productora de Eventos S.A., domiciled in Uruguay.  The entities referenced in this paragraph are referred to collectively below as "Torneos."  In addition, Burzaco and others at Torneos created and/or controlled shell companies off the books of Torneos, including FPT Sports S.A. ("FPT Sports") and Arco Business and Developments Ltd., among others, to effect certain transactions with and on behalf of Torneos.  Through Burzaco and his predecessors and co-conspirators at the company, Torneos and Soccer Official #1 (defined below) developed a close relationship of mutual support, maintained and promoted through the payment of bribes and kickbacks to Soccer Official #1, that contributed to the common benefit of the conspirators.

13.  At various times relevant to the Information, Soccer Official #1 was a high-ranking official of FIFA, CONMEBOL, and the Asociación del Futbol Argentina ("AFA"), the Argentinian soccer federation, which was a national member association of FIFA and CONMEBOL.

14.  At various times relevant to the Information, Soccer Official #2 was a high-ranking official of FIFA and CONMEBOL.

15. At various times relevant to the Information, Sports Marketing Executive #1 was a high-ranking Torneos executive.

16. The identities of the unnamed individuals and entities discussed above are known to the United States Attorney.

\* \* \* \*

17. Soccer Official #1 and Soccer Official #2 were bound by fiduciary duties to each of their respective soccer governing bodies.

IV.  The Scheme

18. The defendant JORGE ARZUAGA and his co-conspirators, including individuals and entities referenced above, devised a scheme and artifice to deprive FIFA and its constituent organizations of their respective rights to honest and faithful services through the payment of bribes and kickbacks. ARZUAGA's role in the scheme was to provide banking advice and support to Torneos, its executives, and Soccer Official #1, including, among other things, by executing payments of over $25 million in bribes and kickbacks by Torneos to FIFA and CONMEBOL officials in exchange for the officials' provision of support and assistance to Torneos in its multi-year

8

efforts to obtain and maintain media and marketing rights to various soccer tournaments and matches.

19. Some of the bribes and kickbacks described above were paid to Soccer Official #1, in exchange for Soccer Official #1's provision of support and assistance to Torneos in its efforts to obtain and maintain media and marketing rights to various soccer tournaments and matches. From time to time, some of these bribes and kickbacks were paid to other soccer officials, including, among others, Soccer Official #2. For the purposes of executing the scheme and artifice, the conspirators did transmit and cause to be transmitted bribe payments in connection with the rights to certain of the soccer events referred to above, made via international wire transfer from, among other accounts, accounts in the United States to accounts in Switzerland at Swiss Bank B managed by the defendant JORGE ARZUAGA.

20. The defendant JORGE ARZUAGA's participation in the scheme began in or about 2010, when he worked at an affiliate of Swiss Bank A. Alejandro Burzaco and Sports Marketing Executive #1 approached ARZUAGA about opening a bank account for the benefit of Soccer Official #1. Thereafter, ARZUAGA attended an event at which he was introduced by Sports Marketing Executive #1 and his associate to Soccer Official #1

as "our banker." From 2010 until 2015, from the time he worked at the Swiss Bank A affiliate and continuing through his employment at Swiss Bank B, ARZUAGA served as a private banker to Torneos, Soccer Official #1, Sports Marketing Executive #1, Burzaco, and others and, in so doing, helped them and other members of the conspiracy to pay and receive bribes to, from, and through bank accounts in the United States, Switzerland, and elsewhere.

21.    The defendant JORGE ARZUAGA and his co-conspirators, including individuals and entities referenced above, sought to conceal the nature, location, source, ownership, and control of the funds and to avoid scrutiny by employing various techniques to obscure their illicit activities. Such techniques included, among others, opening and transferring money to and from bank accounts held in the names of individuals or offshore entities other than the true beneficial owners of the accounts; making false statements on bank documents designed to maintain accurate records of the true beneficial owners of accounts; using "consulting services" agreements and other similar types of contracts to create an appearance of legitimacy for illicit wire transfers and other funds transfers; and maintaining and using multiple accounts at the same bank so that funds transfers between those accounts

10

could be effected internally, without reliance on the
international clearing mechanisms highly visible to law
enforcement.

22.   In furtherance of the scheme and to effect its
objects, the defendant JORGE ARZUAGA worked to promote the
scheme in various ways, including the following:

(a)   On multiple occasions, Sports Marketing
Executive #1 consulted with ARZUAGA regarding the transmission
of bribe and kickback payments to soccer officials.  Among other
matters, Sports Marketing Executive #1 consulted with ARZUAGA as
to bribes paid to multiple soccer officials with the assistance
of a private banker employed by Swiss Bank C and using one or
more bank accounts maintained at Swiss Bank C. The identity of
Swiss Bank C is known to the United States Attorney.

(b)   ARZUAGA managed an account held at an
affiliate of Swiss Bank A in the name of FPT Sports.  ARZUAGA
subsequently opened and managed an account in the same name at
Swiss Bank B (the "FPT Account") that was used to transmit bribe
and kickback payments to multiple soccer officials or their
family members.  ARZUAGA knew that a number of these payments
were made in connection with fraudulent agreements that were
used to justify bribe payments.

11

(c)    ARZUAGA knew that it would be extremely
difficult to open a bank account for Soccer Official #1 given
Soccer Official #1's reputation for corruption.  Accordingly,
ARZUAGA opened and managed a sub-account of the FPT Account,
first at an affiliate of Swiss Bank A, including after the
affiliate was fully integrated into Swiss Bank A, and then at
Swiss Bank B (the "FPT Sub-Account"), which account ARZUAGA
maintained for the true benefit of Soccer Official #1 and into
which bribes, kickbacks, and other illicit payments could be
deposited.  ARZUAGA met with Soccer Official #1 personally on
several occasions and advised him as to the current balance of
the FPT Sub-Account.

(d)    ARZUAGA took various steps to conceal Soccer
Official #1's status as the true beneficial owner of the FPT
Sub-Account.  Such steps included submitting and maintaining
bank documents designed to obscure Soccer Official #1's
beneficial ownership of the FPT Sub-Account.

(e)    Upon the death of Soccer Official #1 in
2014, ARZUAGA arranged for the balance of the funds remaining in
the FPT Sub-Account to be distributed to Soccer Official #1's
heirs.   ARZUAGA discussed the distribution of funds held for
Soccer Official #1 in the FPT Sub-Account with supervisors at
Swiss Bank B, who approved the transfers.  ARZUAGA caused one of

12

the transfers to Soccer Official #1's heirs by knowingly relying upon a fraudulent contract that purported to justify a transfer from the FPT Sub-Account to one of Soccer Official #1's heirs. ARZUAGA did so with the knowledge and approval of supervisors at Swiss Bank B.

(f)   Sports Marketing Official #1 informed ARZUAGA that certain entities under his control and that of Alejandro Burzaco were used to pay bribes and kickbacks to various soccer officials, including Soccer Official #2.

23.   To compensate him for his role in facilitating the payment of bribes and kickbacks and for his role as a financial advisor, the defendant JORGE ARZUAGA received multiple bonuses from Torneos, including via wire transfers to his personal bank account at Swiss Bank D, the identity of which is known to the United States Attorney, made at the direction of Alejandro Burzaco and Sports Marketing Executive #1.   ARZUAGA and his co-conspirators, including individuals mentioned above, used the wire facilities of the United States to effect certain of these payments, for example, as set forth below:

| DATE | WIRE COMMUNICATION |
|------|---------------------|
| November 3, 2014 | Wire transfer of $200,000 from an account in the name of Valente Corp. at J.P. Morgan Chase in New York, New York, for credit to an account in the name of the defendant JORGE ARZUAGA at Swiss Bank D in Zurich, Switzerland. |
| January 5, 2015 | Wire transfer of $450,000 from an account in the name of FPT Sports at Swiss Bank B in Zurich, Switzerland, to a Citibank correspondent account in New York, New York, for credit to an account in the name of the defendant JORGE ARZUAGA at Swiss Bank D in Zurich, Switzerland. |

\* \* \* \*

24.   No disclosure of the foregoing bribery and kickback scheme was made to FIFA, CONCACAF, or CONMEBOL, including without limitation to their respective executive committees, congresses or constituent organizations.

### INTERNATIONAL MONEY LAUNDERING CONSPIRACY

25.   The allegations contained in paragraphs 1 through 24 are realleged and incorporated as if fully set forth in this paragraph.

26.   In or about and between January 2010 and June 2015, both dates being approximate and inclusive, within the Southern District of New York, the defendant JORGE ARZUAGA, together with others, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds from places in the United States to and through places

outside the United States, and from places outside the United
States to and through places in the United States, (i) with the
intent to promote the carrying on of specified unlawful
activity, to wit: wire fraud, in violation of Title 18, United
States Code, Section 1343 (the "Specified Unlawful Activity"),
contrary to Title 18, United States Code, Section 1956(a)(2)(A),
and (ii) knowing that the monetary instruments and funds
involved in the transportation, transmission, and transfer
represented the proceeds of some form of unlawful activity and
knowing that such transportation, transmission, and transfer was
designed in whole and in part to conceal and disguise the
nature, location, source, ownership, and control of the proceeds
of the Specified Unlawful Activity, contrary to Title 18, United
States Code, Section 1956(a)(2)(B)(i).

(Title 18 United States Code, Sections 1956(h) and
3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

27.  The United States hereby gives notice to the
defendant that, upon his conviction of the offense charged
herein, the government will seek forfeiture in accordance with
Title 18, United States Code, Section 982(a)(1), which requires
any person convicted of such offense to forfeit any and all

15

property, real or personal, involved in such offense, or any property traceable to such property.

28.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any

other property of the defendant, up to the value of the

forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and

982(b); Title 21, United States Code, Section 853(p))

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

DEBORAH CONNOR
ACTING CHIEF
MONEY LAUNDERING AND ASSET
RECOVERY SECTION
U.S. DEPARTMENT OF JUSTICE

17